My name is Colin Walsh and I represent the appellants. Dismissal should be reversed because there is no more directly injured person, there is no more direct victim of an employer's scheme to depress wages than the employee receiving those depressed wages. We would not be here today if appellees had not decided to take advantage of both documented and undocumented workers. If appellees had simply decided to pay everyone a fair market rate for their work, there would be no case. But appellees didn't do that. Instead, appellees engaged in a scheme of harboring, transporting, encouraging entry of and hiring undocumented workers at substandard wages in order to drive down wages and then paid their employees those depressed wages. Employees such as appellants in this case, Jesco Wiegert and Jaime Varela. Jesco Wiegert and Jaime Varela both functioned as sales representatives for Intelligent Mexican Marketing and Marketing and Inventory Management. Intelligent Mexican Marketing engages in advertising, marketing, and consulting services for Hispanic brands here in the United States. Mr. Varela and Ms. Wiegert, as sales representatives, were in charge of negotiating sales of those brands to stores such as grocery stores, convenience stores, and gas stations. At this point, the issue is not whether appellees engaged in the RICO predicate acts. It is assumed that they did. At this point, it's not an issue as to whether or not those violations were done in order to drive down wages. Again, at the 12B6 motion to dismiss stage, it must be assumed that that is what they did. It's, again, not an issue here whether or not these RICO predicate acts were the but-for cause of the depressed wages or whether or not appellants, Ms. Wiegert and Mr. Varela, received those depressed wages. Again, at this 12B6 motion to dismiss stage, all of that is assumed to be true and assumed to be the facts of this case. Did you ever plead how many employees were actually employed? Our estimate of the employees is around 100 employees, and that is what appears on a list that was attached to our motion for class certification, and that's what appears in the estimate made by Dr. Nathan Berg. And so the issue in this case is simply whether or not there is some direct relation between the RICO predicate acts of harboring, transporting, encouraging entry of and hiring undocumented workers at substandard wages and the substandard wages that appellees paid to Mr. Varela and Ms. Wiegert and other similarly situated employees. And that is where the district court erred and why this court should reverse the dismissal of this case. And there are three reasons for this. First, there is no more direct victim, as I said, of an employer's scheme to depress wages than the employees receiving those depressed wages. The second reason is that case law backs this up. Since 1976, the Supreme Court has recognized some direct relation between the presence of undocumented workers in the labor pool and depressed wages for other employees. But this is not the only case out there. There's also cases from this circuit, the 11th Circuit, the 9th Circuit, and the 6th Circuit, all finding some direct relation between undocumented workers being taken advantage of and being paid substandard wages and that employer's decision to pay their other employees, their documented employees, substandard wages as well. And finally, the court erred by not considering all of the facts contained in Exhibit 1 to the second amended complaint. And the new facts alleged in the third amended complaint. First, as I said, the facts pledged show that there is no more direct victim of the appellee's scheme to drive down wages. And that's because the facts that we pledged show a direct employment relationship between Intelligent Mexican Marketing and the other appellees and Mr. Varela and Ms. Wiegert. In fact, we pledged that the appellees make all the hiring decisions determining who to hire, what to ask for in hiring, how to hire, what the process is. They make all the decisions regarding compensation, what to pay, how to pay it, when to pay it. And we also allege facts showing that they actually paid employees these wages. Again, these show that there is a direct relationship between the appellee's activities in driving down those wages that it itself decides to pay and then the appellee's decision to actually pay those wages that it was successfully driving down through the RICO predicate acts. In other words, the conduct that they engaged in to drive down these wages is what caused the wages to be driven down. And that is proximate cause under RICO. That is what is responsible for the depressed wages and the injury asserted in this case. And what's surprising if you look at both the district court's opinion and appellee's briefing in this is that no other more direct victim has ever been suggested. Of the numerous victims, of the numerous people that would be injured by an employer's decision to drive down wages, I can think of off the top of my head the U.S. government, business competitors, employees, hospitals, landlords, credit card companies, spouses, significant others, all of these people have some sort of injury due to the depressed wages received by appellants, Mr. Varela and Ms. Wiegand. Let me ask you about the codes you rely on. Is there a breakdown as between the highest paid employees in an establishment and the lowest paid, or is it just a general average? In terms of what we use to show what the market rate is? Right. It's a general average. It's what's used by the Bureau of Labor Statistics. It's what's used by labor economists. But does it identify, like, how many managerial employees there are versus how many janitors? I mean, is it? I don't know how you can rely on this without more background information that you could correlate to your people. Well, the reason we can rely on it is because this is the smallest, the most disaggregated grouping that is available. This is what the market rate is for these services. And so there may be issues about managers receiving more, maybe, or sales representatives being amazing salesmen. More successful. Successful. A higher commitment. But at this stage, those are going to be fact issues that need to be brought out by the other side. It is at least plausible to allege that the government system of determining what the average wage in an industry, and for a particular job within this industry, sales and advertising representatives, it is at least plausible for the motion to dismiss or for the complaint to use that as a market rate. After all, this is what the labor economist, Dr. Nathan Berg, used to determine whether or not wage depression had occurred. And so, again, at this stage, there might be issues with that. And, in fact, appellees argue a lot that, you know, we don't categorize the employees correctly or that there's a more narrow category they could use or that there's a broader category or that there's a different category. But those are all fact issues that have to be determined later on. At this stage, the question is whether it is implausible to say that employees using the government's own standard for determining the average market rate are receiving depressed wages. And they have not asserted any other way to calculate that. They have not asserted that there is a better way to determine what the average market rate is. Instead, they just say, no, that's not right. That's not correct. You're wrong on the facts. And at this stage, that's an inappropriate thing to say. I mean, well, it's not inappropriate, but it's not the correct way to get a motion to dismiss. A motion to dismiss can't be based on a fact dispute raised before they've even answered or before they've engaged in any discovery whatsoever in this particular case. Was this 12B6? This was a 12B6 motion. They have not formally answered. They haven't responded to the discovery. There's been no scheduling order set in this case. This is solely based on what has been planned. And that brings me to the other issue, is that both the trial court and appellees dismiss all factually similar cases based on factual distinctions. But first, in 1976, Scott has recognized that undocumented workers in the labor pool can cause depressed wages. In other words, there's some direct relationship between an employer's use of undocumented workers at substandard wages and their paying of substandard wages to their other employees. The 11th Circuit recognized it in 2006. The 6th Circuit in 2004. The 9th Circuit in 2002. A district court in this circuit recognized it in 2008. In this circuit, just last year, this very month, recognized at least some direct relationship between undocumented workers and depressed wages paid to employees of those employers. And that case was Jackson v. NAACP, in which this court specifically distinguished cases involving RICO violations and depressed wages from the case at hand, and finding no proximate cause in the case in Jackson involving NLRB decisions and entitlement to judgments and violations from those, in cases in which employees of an employer have alleged injury through depressed wages through a pattern of racketeering activity involving harboring, transporting, encouraging entry of, and the hiring of undocumented workers at substandard wages. Like I said, both the trial court's decision and Appellee's dismiss all of those cases on three factual distinctions. That there's no widespread scheme, that there's not sufficient labor pool power, and that the labor market is too broadly defined. First, the labor market in this case is the most narrow available in terms of finding, as we just discussed, the average market rate. So to the extent they disagree with that fact, which is already assumed to be true at this stage, that is evidence that they could present in perhaps a summary judgment motion or a trial. Regarding labor pool power, we actually allege that they have total labor pool power. The labor pool is what they hire from. And here the facts pledge show that Appellee's make all compensation decisions, make all hiring decisions, make all determinations regarding who they hire, and how they hire it, and how they pay it. That is complete labor market power over the people that they hire. And so the depressed wages they pay are because of that. Finally, widespread scheme is another factual distinction they make. And what the district court says, what Appellee's say, is that we do not allege a widespread scheme involving hundreds if not thousands of undocumented workers. This is problematic for a couple of reasons. First, the statute doesn't require any more than ten undocumented workers be hired in order to assert a valid RICO predicate act. But second, that doesn't even, well, because it has to do with proportions. And what we've alleged is that over 50 undocumented workers were hired in the four years preceding the complaint. And with a company that has around 100 employees, that is 50%. In other words, half of these employees may be undocumented. And the facts that must be assumed true, because they're pled in the complaint, show that this is what is happening. And that is certainly a widespread scheme on the same scale as the hundreds if not thousands mentioned in Cunningham, mentioned in Williams v. Mohawk out of the 11th Circuit, mentioned in Mendoza out of the 9th Circuit. But the other reason it's a little misleading is that the widespread scheme we've alleged also involves harboring, transporting, and inducing them to illegally enter the country, or being brought in illegally. And that is a widespread scheme. We've alleged four RICO predicate acts. Have there been any criminal prosecution of these allegations? There has not been any criminal prosecutions that I am aware of regarding these allegations. And finally, the District Court in Appellees failed to properly consider all of the facts contained in Exhibit 1 to the Second Amended Complaint. The case law is pretty clear, but this Circuit and the Supreme Court have said that all documents properly attached to a complaint must be considered. Here, the District Court was explicit in saying, we think that appellants have only relied on the opinion part of this. We're not going to consider the opinion part, and so we're going to throw out the entire document. But that's not what the standard requires. The standard requires looking at all facts and viewing a complaint in its entirety, with all properly attached documents being considered. And here, if they had looked at the report attached, they would have seen facts showing the labor market, facts showing the labor pool power of the appellees in this industry, and the effect on wages. In other words, it would have addressed all of the issues that the court had with the proximate cause analysis. And because of this, there is a direct relation between the employment of undocumented workers, between an appellee's scheme to drive down wages, and the employees who receive those depressed wages. If Your Honors have no further questions, I'll reserve the rest of my time. Thank you, Mr. Waller. Brown? May it please the Court, good afternoon. I'm John Brown, and I'm arguing on behalf of all of the appellees. The two appellates who earned divergent salaries, and only one of whom was eligible to earn commissions, seek to pursue RICO class claims because they allegedly did not earn the average salary of an individual in Dallas County, Texas, or Harris County, Texas, who provides, quote, advertising and consulting services, end quote. Judge Boyle, however, correctly held that the Second Amendment complaint comes up short. The appellants have failed to allege sufficient facts to support a plausible RICO claim. Under 12b-6, a complaint that is not facially plausible must be dismissed, and plausibility means more than mere possibility. Here, the Court, in looking to determine whether the complaint states a plausible claim, must also consider whether there are well-pleaded facts sufficient to allow the Court to draw a reasonable inference of a right to relief. Labels and conclusions are simply insufficient. Furthermore, whether the complaint states a plausible claim is a context-specific task requiring the Court to draw on its judicial experience as well as common sense. In the Second Amendment complaint, the allegations do not plausibly demonstrate proximate causation. The Supreme Court has clearly held that in the RICO context, the focus of the proximate cause analysis is on the directness of the relationship between the alleged conduct and the alleged harm. According to Anza, the central question a court must ask is whether the alleged violation led directly to the plaintiff's injuries. But here, the appellants aren't alleging a direct harm. They are pushing forward a market-based theory based on supply and demand that involves two steps. First, they say that the appellees violated immigration laws and that that somehow inflated the labor market. Then, that inflated or expanded labor market then depressed wages. So we don't have a direct relationship. But even if you have a RICO plaintiff and a defendant that have a direct relationship between themselves, the causal link between the injury and the conduct may still be too weak to constitute proximate cause. That may be because the causal link is illogical, it's speculative, or because there are intervening causes. The Supreme Court in the Hemigroup case held that a court must dismiss a RICO claim if it rests on an overly attenuated chain of inferences, which is exactly what we have here. The appellants really misunderstand the pleading standard. They focus on this idea that they must be the most direct victims. And they focus heavily on the predicate acts, and they talk about what their salaries were from IMN and MIM. But they fail to allege a sufficient causal chain. And we see that on the Second Amendment complaint, on its face, because appellant Varela earned a salary of $46,000 a year. Weigert earned only $26,000 a year. So we have a $20,000 gap between the two appellants. That means that Varela was earning about 75% more than Weigert just in salary. There's no explanation offered. There's no factual information contained in the complaint to say why is there this gap. If the appellants are correct that their wages are a reflection of the predicate acts, then the appellants, because they allegedly did the same thing, should have the same salaries or nearly the same. That's what you would expect to see. But that's not the case. We see very different salaries. But there's more than that because only Varela was eligible to earn commissions. In the complaint it says that he could earn commissions of 4% to 6% off of his sales. Now, again, there's no explanation about why it is that Weigert was not eligible to earn the commissions. They're silent about that. Then you go one step further. How much did Varela earn in commissions on top of his salary? The complaint is silent. It doesn't address that issue. There's no reference to the dollar amount earned by Varela in commissions. Now, clearly there are a number of unrelated factors that affect compensation. And those factors could include market factors, experience, education, and just skill in making sales. Now, we don't necessarily argue that they must necessarily address all of those potential factors. But we do argue that they must allege a specific and direct causal link between the predicate acts and their wages that make it clear that these other factors aren't in play. But the appellant's allegations are too vague and attenuated to satisfy this requirement. These conclusory statements that the predicate acts expanded the labor force and then depressed the wages are not enough. In the complaint, what the appellants offer is an abstract market theory based on supply and demand. But there aren't enough facts alleged in the complaint to even support the supply and demand theory. We don't have any allegations about the number of employees IMM has or MIM has. What counsel said was there's another document, not the complaint, that references the number of employees they have. There's nothing in the complaint about the total number of employees. So there was no pleading that stated 100? No, there's not. Is the document he's referring to attached to the pleading? Is that attached? No, Your Honor. What I believe he's referring to is a motion for certification that they had filed early on in the case. He said it was a list or an expert's report or something. So that's not in the pleading. There is a list attached to that other motion. So it's not part of the complaint. And in the expert report, the expert just assumes that they had so many employees. He does not state IMM had X number or MIM had X number. Also missing from the complaint is the number of employees that held the same positions as the appellants. Also missing is any information about the number of illegal workers allegedly hired. And, of course, there's nothing in the complaint about the wages paid to those illegal workers. Now, what's interesting is there's this suggestion of, well, they must have been hiring illegal workers and engaged in these predicate acts to depress wages. Actually, in the complaint, the second amended complaint, paragraph number 45, which is on page 345 of the record, it says that Defendant Benitez has threatened his sales representatives, including Varela and Wiegert, that if sales did not improve, he would bring over more people from Mexico. Well, that suggests it's about the appellants not being successful in their sales, which is different than the theory that counsel proposes. The bottom line is that there are no facts demonstrating just how this labor pool was expanded, to what extent it was expanded. And if the appellants are allowed to proceed with these class RICO claims, then the court will be taken down a speculative path. The court will be forced to engage in the type of intricate, uncertain inquiries that ANZUS seeks to preclude. To borrow a phrase from Twombly and Iqbal, the second amended complaint lacks the factual enhancement necessary to plausibly demonstrate proximate cause. Now, there also are no real allegations in the second amended complaint about the depressed wages. There are these conclusory references to depressed wages, and they cite to the Bureau of Labor Statistics. That's it. Well, the Bureau of Labor Statistics apparently groups advertising and consulting services. Those are actually two groups, but they combine them. And they said the average salary for someone in that group is $78,000 to $81,000 a year in salary. Well, of course, that is a very broad and vague group. It would include everybody from the door-to-door salesman to the highest level executive with an advanced degree. It would be as if a legal assistant at a small firm in Dallas County complained about not making the average salary of someone in the legal industry. Well, of course, the Dallas County legal industry would include not just legal assistants, but legal secretaries and the lawyers, private lawyers at small firms and big firms, lawyers practicing bankruptcy or corporate law or personal injury law. It would include all the public sector lawyers. It would include the judiciary. And so a comparison to such a broad and vague group is not helpful, and it doesn't suggest plausibility. What also is missing from this complaint is any information about comparators. The appellants don't allege what competitors pay for this type of work. The appellants don't even allege what they made in prior employment or subsequent employment. All we have are what their salaries are, and no reference to the dollars earned by Mr. Varela in commissions. There are some cases that counsel referenced not binding on this court from other circuits. Factually, they're distinct. That is true, but they're also different because they're pre-Twombly, pre-Iqbal, and they apply the wrong standard. But first, the facts. Those cases involve manual laborers doing things like picking fruit or working at a poultry processing plant. They don't involve someone in sales. Those cases involve very large employers allegedly hiring hundreds or thousands of illegal workers. And there are allegations of market dominance in those cases. None of those factors are alleged here in the second amended complaint. And in at least two of those cases from the other circuits, there were references to criminal investigations for immigration violations. There's no such allegation in this case. But more important than those factual distinctions is the fact that they do not apply the plausibility standard that governs 12b-6. And so, more recently, the 11th circuit, in the case of Simpson v. Sanderson Farms, dealt with a case where there was this similar allegation of immigration violations leading to depressed wages. And there, the district court had dismissed the case on 12b-6. It goes to the 11th circuit and the 11th circuit firm. The 11th circuit really focused on proximate cause and held that there weren't sufficient facts to support proximate cause and dismiss the case. But there's one other piece to this Sanderson Farms case that is noteworthy. And that is they looked at the Mohawk opinion, which was another 11th circuit case. And they said, you know, Mohawk and those other cases, including Mendoza out of the 9th circuit and the Tyson Fuge case out of the 6th circuit, they said they applied the wrong standard. They're not dealing with plausibility, and therefore they're not helpful to our analysis. And they're not helpful to this case as well. When the appellants were given the opportunity to file the second amended complaint, they attached the report of the so-called expert, Dr. Berg. Well, that report was not properly attached under Rule 10 because it's not a written instrument. It's not like a contract or a will or a document setting out rights. It's not a document that exists outside of this case. It's a document that is an opinion piece. Did you move to have it stricken? We did not, Your Honor. But even if they got past Rule 10, the question is, what facts are in the report? And there aren't. You don't see the factual information that is necessary to discuss the market or to discuss the actual practices of IMM and MIM. There's no more information about wages paid either to the appellants or to similar employees either within IMM and MIM or with other competitors. And this court in Financial Acquisition Partners v. Blackwell dealt with a similar situation where an expert report was attached, and the court held that the opinions contained within that report were not appropriate. They do not advance the case in terms of meeting the plausibility standard under Rule 12b-6. And Dr. Berg's report does not help to save the second amended complaint. Finally, Judge Boyle did not abuse our discretion in denying the motion for leave to amend again. The appellants were given numerous opportunities to state their best case. It is their second amended complaint that was dismissed with prejudice. So they were given those three opportunities. But more than just the opportunities, Judge Boyle issued a very lengthy, detailed analysis, a 26-page opinion that's a road map. She told the appellants, I've looked at the whole thing. Here are your shortcomings. If you want to try again, you can plead again. Take, you know, take your best shot. And she offered them the opportunity to provide a synopsis explaining how they believed the second amended complaint had got them across the line of plausibility. A district court has the discretion to manage its docket. And a plaintiff cannot be given limitless opportunities to try to meet a pleading standard. Here, Judge Boyle provided numerous opportunities. It was more than reasonable. And she did not abuse her discretion in denying their motion for leave. For all of these reasons, we respectfully request that the court confirm Judge Boyle's orders dismissing the second amended complaint with prejudice and denying the motion for leave to amend the complaint. Thank you. Thank you, Mr. Brown. Mr. Walts. Thank you, Your Honor. Appellees have thrown up several red herrings in this case. So they basically argued a summary judgment motion. They've been saying that it's not plausible that an employer's RICO predicate acts of harboring, transporting, hiring undocumented workers at substandard wages would cause them to pay substandard wages because the employees have different job positions. Well, that's a red herring. Whether or not the job position is different, when we allege that they function in the same job position, so we actually meet that. But whether or not it's different has nothing to do with whether the employer is paying less than the market rate because of the RICO violations. The difference in salary between Ms. Wiegert and Mr. Varela is similarly another red herring. It simply doesn't matter whether one of them gets commissions and whether one of them doesn't get commissions if the employer is depressing everybody's wages who functions as sales reps. The idea that somehow somebody who gets a commission cannot have a depressed wage just doesn't make sense. The way it would be depressed would be they would get lesser commission than people working at other companies performing the same jobs. But the other red herring that they throw up is that they say ANZA is on point. And ANZA was the Supreme Court decision talking about proximate cause, and Hemigroup is another one that follows in line with Hemigroup. But if you look at the Supreme Court decisions going all the way back to Holmes, which is what ANZA applied, you have Holmes, you have ANZA, you have Hemigroup, and you have Lexmark. And what becomes clear in all of these opinions is that the key to injury, the key to proximate cause, is whether or not the injury was caused by the conduct alleged of appellees or whether the injury is derivative of another's injury. So in ANZA, the injury was derivative of the public not going and buying from ANZA. In other words, because the public decided we're going to go buy cheaper products elsewhere, it's actually the public that caused ANZA's injury. And it didn't help that the RICO allegations in that case were about mail and wire fraud against the state. Same thing is true with HEMI. Again, HEMI has lost profits. Well, Hemigroup is similar because it also involves an intervening injury from the public. The public didn't go and report taxes and so didn't pay taxes allegedly. And that's where the direct relation comes from. Here, there is a direct relation between an employer driving down wages or engaging in RICO acts with the purpose of driving down these wages, being successful at that scheme, and then paying those depressed wages. They did not suggest, and I was listening very carefully, they didn't suggest a single other injured victim, more directly injured victim, or somebody better situated to bring suit. The civil RICO statute clearly allows violations of Immigration and Nationality Act to function as predicates. Which means that Congress envisioned suits like this from employees who have been taken advantage of by employers who are driving down wages and paying people substandard wages because of the predicate acts that they're being involved in. The market factors, the experience, the skill, first, again, these are similarly red herrings. These are interesting facts and these can be brought out in summary judgment, they can be brought out in trial. But again, whether or not somebody is extremely skilled or not very skilled has nothing to do with the employer's scheme to drive down wages and then paying that highly skilled employee these depressed wages. It might just make that particularly highly skilled employee more irritated that he's getting such a depressed wage, but it doesn't make it more plausible than not that an employer hiring people on substandard terms would pay its other employees substandard wages. This is a simple case. This is not a case involving immigration policy or the pros and cons of undocumented workers in the American workforce. This is a simple case of an employer taking advantage of all of his employees through a scheme to pay them less. Succeeding in that scheme and then paying employees such as Ms. Wiegert and Mr. Varela and those similarly situated less because their scheme succeeded. That is but-for causation and that is proximate causation and they haven't cited anything that changes that. If your honors have no other questions, then we simply ask that you reverse the trial court's dismissal of this case and remand for further proceedings. Thank you, Mr. Walsh. Case for today will be adjourned until.